UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JONATHAN CRUZ-VEGA,

                              Defendant.

REPORT & RECOMENDATION

20-CR-6101-02-EAW-MJP

**PEDERSEN, M.J.** On March 1, 2022, the Court heard oral argument on Defendant's Supplemental Motion to Suppress Tangible Evidence recovered from 195 Campbell Park. (Feb. 17, 2022, ECF No. 632.)[1] The undersigned recommends that the district judge deny the motion to suppress tangible evidence.

## STANDARD OF LAW

Probable cause to search a place exists if the issuing judge "make[s] a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The standard is one of "probability, and not a prima facie showing of criminal activity  .

---

[1] Defendant was originally represented by James P. Vacca, Esq., who was relieved on May 5, 2020, by Peter Pullano, Esq. Mr. Pullano filed his original omnibus motion on September 9, 2021, ECF No. 549. The undersigned filed an order regarding Defendant's omnibus motion (Omnibus Order, Nov. 23, 2021, ECF No. 583), which granted leave to file additional motions. The supplemental motion, ECF No. 632, simply added an affidavit from Defendant asserting a basis for standing to oppose the search of 195 Campbell Park. As a result, the government's opposition removed its lack of standing argument. (Gov't's Resp. in Opp'n, Feb. 25, 2022, ECF No. 637.)

. . . ." *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir. 1983). Probable cause "need not be based on direct, first-hand, or hard evidence." *United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir. 1985).

Once a search warrant has been issued, a reviewing court must accord substantial deference to the issuing judicial officer's prior finding of probable cause. The affidavit that supported the application "must be tested and interpreted by . . . courts in a common sense and realistic fashion." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). The Second Circuit has summarized the principles that should guide a court in reviewing the probable cause determination of the judicial officer who issued the warrant:

> [The reviewing court's] after-the-fact examination of the papers is not to be de novo review. It should start with the proposition that the Magistrate's finding of probable cause is entitled to substantial deference. In fact, a search based upon a magistrate's determination will be upheld by a reviewing court on less persuasive evidence than would have justified a police officer acting on his own. Further, the magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of this warrant. This is particularly true in close cases where doubts should be resolved in favor of upholding the warrant.

*Travisano*, 724 F.2d at 345; *see also, United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993).

## ANALYSIS

The undersigned issued the search warrant for 195 Campbell Park having found that the affidavit submitted by DEA Special Agent Sabatino Smith established

sufficient probable cause that the residence would contain evidence of criminal activity.[2]

In his affidavit, Special Agent Smith stated that Defendant resided at 195 Campbell Park, Rochester, New York, and used 10 Strathmore Circle, Apartment D, Rochester, and 16 Village Way, Rochester, "as stash locations for narcotics." (Smith Aff. ¶ 10, Apr. 28, 2020, ECF No. 1.) He outlined Defendant's prior convictions for weapons possession, a controlled substance offense, and menacing dating from July 2002 through September 2013. (*Id.*) It describes a controlled purchase of heroin/fentanyl from Defendant in January 2020 through a confidential source. (*Id.* ¶ 80.) After contacting Defendant by phone, the confidential source met him at a location. Defendant was observed driving directly from his residence to the meet location. (*Id.* ¶ 81.) Once at the location, Defendant evidently directed the confidential source to a second meet location, where the sale was accomplished. (*Id.* ¶ 82–83.) These and the surrounding paragraphs establish Defendant's involvement with narcotics sales, and his access to fentanyl. After the sale, Defendant returned to his residence. (*Id.* ¶ 86.) A confidential source made a second and third purchase of narcotics from Defendant in February 2020. (*Id.* ¶¶ 89–95.) A confidential source made a fourth purchase of narcotics from Defendant in March 2020. (*Id.* ¶¶ 96–98.) In April 2020, a confidential source made a fifth purchase of narcotics from

---

[2] Special Agent Smith's affidavit consists of 454 paragraphs over 171 pages and was filed in support not only of the search warrants, but also in support of the criminal complaint. (Compl., Apr. 28, 2020, ECF No. 1.) The affidavit refers to the relevant place to be searched as: "195 CAMPBELL PARK (Rear Apartment), ROCHESTER, NEW YORK (Premises 7)." (*Id.* at 2.)

Defendant. (*Id*. ¶¶ 99–101.) In a later paragraph, Special Agent Smith alleges:

"Controlled substances, proceeds of drug sales, records, and other evidence which can

be easily and readily disposed of or destroyed are believed to be inside" 195 Campbell

Park. (*Id*. ¶ 399.) Also in his affidavit, Special Agent Smith stated:

> 377. Based on my training, experience, and participation in this and
> other drug trafficking and money laundering investigations and based
> upon my discussions with other experienced DEA Agents, and Federal,
> State, and Local drug investigators, I know that:
>
> a. Traffickers of controlled substances frequently maintain, at their
> residence, place of business or inside their vehicles quantities of
> narcotics to maintain their ongoing drug distribution business;
>
> b. In addition to drugs, traffickers of controlled substances usually keep,
> at their residence, place of business or inside their vehicles,
> paraphernalia for the packaging, diluting, cutting, weighing, processing
> and distributing of controlled substances, including scales, plastic bags,
> cutting agents and utensils;
>
> c. Traffickers of controlled substances commonly keep firearms in their
> homes, vehicles, and businesses to protect themselves, their narcotics,
> and the proceeds from their narcotics sales, and I am aware that many
> courts, including the Second Circuit United States Court of Appeals,
> have found that weapons and firearms are among the "tools of the trade"
> in the narcotics business;
>
> d. Traffickers of controlled substances commonly maintain records,
> notes, and other papers relating to drug trafficking, some of which may
> be in code, including but not limited to sales receipts, shipping labels,
> shipping receipts, shipping boxes, order forms, storage receipts, records,
> operating manuals, computer records, publications, notes, checks,
> money orders, and money transfer receipts. The aforementioned records,
> notes, and other papers are commonly maintained where the drug
> possessor/trafficker has ready access to them, such as on their person,
> or in their homes, vehicles or businesses, or even in electronic storage
> devices, including, but not limited to computers, computer storage
> devices, tablets, and cellular telephones;
>
> e. Traffickers of controlled substances commonly maintain records,
> books or papers that reflect addresses or telephone numbers for their
> associates or sources of supply and such items may be in code. The above
> addresses and telephone numbers may also be stored in electronic

storage mediums, including but not limited to cellular telephones, computers, and computer storage devices;

f. Traffickers of controlled substances commonly take, or cause to be taken, photographs/videos of themselves, their associates, their property, their drugs, or their firearms, and usually maintain these photographs/videos in their residences. The above photographs/videos may also be stored in electronic storage mediums, including but not limited to cellular telephones, digital cameras, tablets, home computers, and computer storage devices;

g. Traffickers of controlled substances commonly maintain cellular telephones and other communication devices on their person, in their residences, in their vehicles, and in their businesses, that are utilized to further their firearm and drug trafficking activities, including contacting other individuals with whom they traffic drugs; certain electronic devices, including i-Phones, Blackberries, i-Pods, and Android phones, store information such as email messages, chats, multimedia messages, installed applications or other electronic communications, calendars, notes, passwords, dictionary entries, Global Positioning Satellite ("GPS") entries, internet protocol connections, and location entries, including cell tower and WiFi entries internet or browser entries or history. In addition, these devices often contain proprietary software, in the form of system, data, or configuration information, which enable the types of information and data described above to be accessed and analyzed. These items remained stored on the electronic devices even if the device in question has lost all battery power, and has not been used for an extended period of time. In this case, cell phones and smart phones are particularly important to the targets and likely to contain valuable evidence of drug trafficking and other criminal activity by the defendants and other coconspirators. The investigation has revealed that the great majority of communications between and among the defendants was via end-to-end encrypted media such as FaceTime. Messages sent via this medium are likely to be maintained in the respective phones of the defendants, which phones are likely to be in the residences and other locations sought to be searched (people keep their cell phones with them).;

h. Traffickers of controlled substances commonly keep and utilize personal computers and tablets to further their drug trafficking activities. The use of personal computers and Tablets by drug traffickers, as well as by the general public, has increased dramatically during the past decade. During the past two years alone, myself and/or other members of the investigative team have participated in investigations where computers, tablets and cellular telephones were seized and searched pursuant to court authorized search warrants that

contained digital photographs of drugs, firearms, and bulk cash as well as text messages indicating locations of drug transactions. I am also familiar that that the search, retrieval, analysis, documentation and authentication of all such electronically stored computer data (to include cellular telephones) requires analysis by a qualified computer specialist to prevent the loss of data either from accidental or deliberate destruction; and

i. Traffickers of controlled substances must maintain, on hand, United States currency in order to maintain and finance their ongoing drug business and the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers. . . .

(*Id.* ¶ 377.)

Upon review, the Court finds no reason to determine that the search warrant application was deficient, or that DEA Special Agent Smith misled the Court. Accordingly, **the undersigned recommends that the district judge deny the motion to suppress tangible evidence seized from 195 Campbell Park** (ECF No 632). No further motions are outstanding according to the docket of this case and it appears ready for trial.

Pursuant to 28 U.S.C. § 636(b)(1), the Court hereby:

**ORDERS**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.

The district court will ordinarily refuse to consider on de novo review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order***.

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

IT IS SO ORDERED.

DATED:      March 2, 2022
            Rochester, New York

MARK W. PEDERSEN
United States Magistrate Judge

7